JASON FRANCO, ABIGAIL
FRANCO, MISTY M. LACY, and
JOHN D. BAKER, individually and on
behalf of all other similarly situated class
and subclass members,

        Plaintiffs,

        v.

CHOBANI, LLC,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 1:23-cv-03047

Judge John J. Tharp, Jr.

## MEMORANDUM OPINION AND ORDER

When plaintiffs Jason Franco, Abigail Franco, Misty Lacy, and John Baker purchased Chobani's sugar-free yogurt, they thought they were getting a sweet deal. But the deal, it turns out, was sweeter than they anticipated—four grams of allulose per serving sweeter.

Allulose, the plaintiffs say, is sugar. And calling a product that "contains quite a lot of sugar" Chobani Zero Sugar, they contend, is "just plain wrong." Compl. 2 ¶ 5, ECF No. 1. Alleging intentional mislabeling and deception, the plaintiffs sued Chobani for violating "a whole host of laws." *Id.* More specifically, on behalf of (1) a putative nationwide class, and (2) putative state-specific subclasses, the plaintiffs sued Chobani for violating the consumer-protection laws of 37 states. The 43-count complaint also seeks a declaratory judgment, recovery for unjust enrichment, and the imposition of a constructive trust.

Chobani now moves to dismiss, arguing that the plaintiffs' claims are preempted by federal law. The Court agrees. For the reasons that follow, Chobani's motion to dismiss is granted. Lacy and Baker's individual claims are dismissed without prejudice, and the remaining claims are dismissed with prejudice.

# I.    BACKGROUND[1]

## A.    The Complaint

In 2023, plaintiffs Jason and Abigail Franco purchased Chobani Zero Sugar yogurt at a Costco store in Oak Brook, Illinois. The Francos "reasonably believed" the yogurt to be sugar-free; it was labeled "Chobani Zero Sugar," after all. *Id.* at 3 ¶¶ 8-9. And in any event, the yogurt's packaging repeatedly emphasized its lack of sugar:



---

[1] In reviewing Chobani's motion to dismiss, the Court "accept[s] as true all factual allegations in the . . . complaint and draw[s] all permissible inferences in . . . favor" of the plaintiffs. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quotation marks omitted).

Chobani® Zero Sugar
has no sugar*.
Naturally.

*Not a low calorie food.

Compl. Ex. 1 at 5-6, 8, ECF No. 1-1.[2] Plaintiffs Misty Lacy and John Baker made similar

purchases, also in 2023.[3] They, too, evidently "believed that [Chobani Zero Sugar] contained zero

sugar." Compl. 3-4 ¶¶ 10-11.

But Chobani Zero Sugar, the plaintiffs say, does not contain zero sugar. Instead, it contains

four grams of allulose per serving.[4] Allulose, the parties agree, is a monosaccharide—a "simple

sugar." *Monosaccharide*, Brittanica, https://www.britannica.com/science/monosaccharide (last

visited May 7, 2025); *see* Compl. 9 ¶ 35 ("Allulose is a sugar."); *id.* at 2 ¶ 7 ("There is no such

thing as zero sugar allulose; it doesn't exist." (quotation marks omitted)). And the plaintiffs submit

that marketing a product containing four grams of sugar per serving as sugar-free is both

"[m]isleading" and "wrong." Compl. 26 ¶ 110. The plaintiffs filed the instant suit in May 2023,

claiming that Chobani "tricked" them "into buying . . . deceptively labeled" yogurt in order to

boost its bottom line. *Id.* at 12 ¶ 49; *see, e.g.*, *id.* at 7 ¶ 28 ("Tricking consumers into believing that

Chobani Zero Sugar actually contained zero sugar was . . . key to Chobani's strategy to grow sales,

---

[2] The asterisks in the above images all point to text reading as follows: "Not a low calorie food." No asterisk points to text qualifying or otherwise explaining the "zero sugar" or "no sugar" statements.

[3] Lacy made her purchase at a Safeway store in Tucson, Arizona, while Baker made his purchase at a Cosentino's Market in Overland Park, Kansas.

[4] Although Chobani Zero Sugar lists allulose as an ingredient, *see, e.g.*, Compl. Ex. 1 at 4-8, it does not list the quantity of allulose per serving. In the plaintiffs' telling, they first learned that each serving of Chobani Zero Sugar contains four grams of allulose after "some digging on the Chobani website." Compl. 17 ¶ 70; *see id.* at 17-18 ¶¶ 72-73.

and [Chobani Zero Sugar] was a key selling point when marketing the Chobani IPO to potential new shareholders." (capitalization altered)).

The complaint, brought on behalf of (1) nationwide, and (2) state-specific Chobani Zero Sugar purchasers, asserts 40 counts under 37 states' consumer-protection laws.[5] It also seeks the imposition of a constructive trust (count 41), disgorgement of profits based on unjust enrichment (count 42), and a declaration that Chobani Zero Sugar's labeling is "deceptive and likely to mislead" consumers (count 43). *Id.* at 94.

Key for present purposes, the complaint spends 15 pages arguing that the plaintiffs' claims are "not subject to preemption or abstention." *Id.* at 12 (capitalization altered); *see id.* at 12-26 ¶¶ 49-109. As to the first, the complaint asserts that its "state law claims are not subject to any preemption" because Chobani's "deceptive labeling also violates federal laws and regulations regarding food labeling." *Id.* at 13 ¶ 51. As to the second, the complaint urges the Court to exercise its jurisdiction because "there is no indication that the FDA plans to amend [its relevant] regulations" any time soon. *Id.* at 23 ¶ 96; *see also id.* at 25 ¶ 107.

### B. The FDA and Allulose

To understand the above arguments—reiterated in response to Chobani's motion to dismiss—it is important to first understand (1) the FDA's regulatory scheme for food labeling, and (2) how allulose interacts with that scheme. The Court provides a brief overview of both topics below.

---

[5] Three counts under California law, two counts under New York law, and one count under the laws of each of the following states: Alabama, Arizona, Colorado, Connecticut, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Vermont, Virginia, Washington, and Wisconsin.

## 1. Labeling Regulations

In the Food, Drug, and Cosmetic Act, as amended by the Nutrition Labeling and Education Act of 1990, Congress "empowered the FDA to oversee and regulate food labeling." *Id.* at 13 ¶ 52; *see* 21 U.S.C. § 343(q)-(r). Together, the Acts allow the Commissioner of Food and Drugs to promulgate regulations in two broad categories. First, the Commissioner may regulate the "nutrition information" required for food products, perhaps by altering the necessary contents of the now-familiar Nutrition Facts panel.[6]



21 U.S.C. § 343(q)(1)-(2); *see* 21 C.F.R. § 101.9(d)(11)(iii). Second, the Commissioner may regulate (in both form and substance) labels characterizing "the level of [a] nutrient" like sugar.[7] 21 U.S.C. § 343(r)(1)-(2). For clarity, the Court refers to regulations in the first category as nutrition-panel regulations, and those in the second category as labeling regulations.[8]

---

[6] The Nutrition Facts panel that follows is a sample that appears in the FDA's main nutrition-panel regulation. 21 C.F.R. § 101.9(d)(11)(iii). It does not relate to Chobani Zero Sugar in any way, and the Court provides it here only as an example.

[7] Although Congress delegated the authority to promulgate these regulations to the Secretary of Health and Human Services, the Secretary redelegated the authority to the Commissioner. *See, e.g.*, *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 186 (E.D.N.Y. 2013).

[8] The FDA uses the term "nutrition labeling" to describe regulations in the first category, and the term "nutrient content claim" to describe regulations in the second category. *See, e.g.*, 21 C.F.R. §§ 101.9(a)(1), 101.13(b). The Court uses "nutrition-panel regulations" and "labeling regulations" to better distinguish between the two categories.

Before proceeding, it is worth discussing the relationship between nutrition-panel and labeling regulations. Nutrition-panel regulations govern the language "within the four walls of" the Nutrition Facts panel. Compl. 13 ¶ 55. Labeling regulations, meanwhile, govern any language outside of that panel. So, nutrition-panel and labeling regulations govern mutually exclusive domains of a product's packaging: "If a statement from inside the [Nutrition Facts] panel is repeated outside [that] panel, [the repeated statement] . . . must adhere to the [relevant labeling] regulations" rather than the relevant nutrition-panel ones. *Id.* at 14 ¶ 58 n.20 (emphasis omitted); *see* 21 C.F.R. § 101.13(c) (if information "required or permitted" in the Nutrition Facts panel "is declared elsewhere on the label or in labeling," it is "subject [only] to" labeling regulations). Similarly, if a statement from the product's label is repeated inside the Nutrition Facts panel, the repeated statement is governed by the relevant nutrition-panel regulations, not the relevant labeling ones. *See* 21 C.F.R. § 101.13(c) (if information "appears as part of the" Nutrition Facts panel, it is "not subject to" labeling regulations).

The Commissioner has promulgated two relevant regulations regarding sugar. The first, a nutrition-panel regulation, governs the Total Sugars declaration seen above:

> (ii) "Total Sugars": A statement of the number of grams of sugars in a serving, except that the label declaration of sugars content is not required for products that contain less than 1 gram of sugars in a serving if no claims are made about sweeteners, sugars, or sugar alcohol content. [In general], if a statement of the total sugars content is not required and, as a result, not declared, the statement "Not a significant source of total sugars" shall be placed at the bottom of the table of nutrient values in the same type size. ***Total sugars shall be defined as the sum of all free mono- and disaccharides (such as glucose, fructose, lactose, and sucrose).*** Total sugars content shall be indented and expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero.

21 C.F.R. § 101.9(c)(6)(ii) (emphasis added). The Court refers to this as the "Nutrition-Panel Regulation." Note the emphasized language: For purposes of the Nutrition Facts panel, a sugar is a "free mono- [or] disaccharide[] (such as glucose, fructose, lactose, and sucrose)." *Id.*

The second regulation, a labeling regulation, governs whether and when a product can be labeled sugar-free:

(1) Use of terms such as "sugar free," "free of sugar," "no sugar," "zero sugar," "without sugar," "sugarless," "trivial source of sugar," "negligible source of sugar," or "dietarily insignificant source of sugar." Consumers may reasonably be expected to regard terms that represent that the food contains no sugars or sweeteners e.g., "sugar free," or "no sugar," as indicating a product which is low in calories or significantly reduced in calories. Consequently, [subject to an exception not applicable here], a food may not be labeled with such terms unless:

(i) The food contains less than 0.5 g of sugars, as defined in § 101.9(c)(6)(ii), per reference amount customarily consumed and per labeled serving or, in the case of a meal product or main dish product, less than 0.5 g of sugars per labeled serving; and

(ii) The food contains no ingredient that is a sugar or that is generally understood by consumers to contain sugars unless the listing of the ingredient in the ingredient statement is followed by an asterisk that refers to the statement below the list of ingredients, which states "adds a trivial amount of sugar," "adds a negligible amount of sugar," or "adds a dietarily insignificant amount of sugar;" and

(iii)

(A) It is labeled "low calorie" or "reduced calorie" or bears a relative claim of special dietary usefulness labeled in compliance with [other] paragraphs . . . of this section, or, if a dietary supplement, it meets the definition in [another] paragraph . . . for "low calorie" but is prohibited by [other regulations] from bearing the claim; or

(B) Such term is immediately accompanied, each time it is used, by either the statement "not a reduced calorie food," "not a low calorie food," or "not for weight control."

*Id.* § 101.60(c)(1).[9] The Court refers to this as the "Labeling Regulation." Particularly relevant here, the Labeling Regulation incorporates by reference the definition of sugar in the Nutrition-Panel Regulation. *Id.* § 101.60(c)(1)(i).

### 2.    The Allulose Guidance

Recall that, under the definition above, a sugar is a monosaccharide or disaccharide "such as glucose, fructose, lactose, [or] sucrose." *Id.* § 101.9(c)(6)(ii).[10] Allulose is a monosaccharide, and its chemical composition is nearly identical to that of fructose. Compl. 10 ¶¶ 37-38; *see also, e.g.*, Compl. Ex. 2 ("Allulose Guidance") at 2, 6, ECF No. 1-2. So is allulose a sugar for purposes of the Nutrition-Panel Regulation? The FDA has never definitively said. In a final rule issued in 2016 (the "2016 Rule"), for example, the FDA responded to comments (1) noting that allulose "does not have the . . . properties of fructose or other sugars," and (2) seeking to exclude allulose from the regulatory definition of sugar:

> We need additional time to fully consider the information provided in the comments and [a related] citizen petition. Therefore, the final rule does not reach a decision as to whether Allulose should be excluded from the [definition] of sugar[] . . . , and Allulose, as a monosaccharide, must be included in the [Total Sugars] declaration . . . pending any future rulemaking that would otherwise exclude this substance from the declaration.

Food Labeling: Revision of the Nutrition and Supplement Facts Labels, 81 Fed. Reg. 33,742, 33,795-96 (May 27, 2016). Although the FDA indicated that allulose should be *included* in the Total Sugars declaration (and thus treated as a sugar) for the time being, it expressly declined to "reach a decision" on how allulose fits into 21 C.F.R. § 101.9(c)(6)(ii). *Id.* at 33,796.

---

[9] The language in 21 C.F.R. § 101.60(c)(1)(iii)(B) explains the "not a low calorie food" language in the Chobani screenshots above. *See supra* note 2 and accompanying text.

[10] As noted, a monosaccharide is a "simple sugar" with a specific chemical structure. *Monosaccharide*, *supra*. A disaccharide is a "compound . . . composed of two" monosaccharides "linked to each other." *Disaccharide*, Brittanica, https://www.britannica.com/science/disaccharide (last visited May 7, 2025).

In 2020, after taking "additional time to fully consider" the properties of allulose, *id.*, the FDA issued a final guidance document (the "Allulose Guidance") entitled "The Declaration of Allulose and Calories from Allulose on Nutrition and Supplement Facts Labels: Guidance for Industry."[11] That document began with the following text:

> This guidance represents the current thinking of the Food and Drug Administration (FDA or we) on this topic. It does not establish any rights for any person and is not binding on [the] FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.

Allulose Guidance 1. It then advised manufacturers of the Administration's intent "to exercise enforcement discretion for the exclusion of allulose from the amount of Total Sugars . . . declared on the [Nutrition Facts panel] . . . pending review of the issues in a rulemaking." *Id.* (quotation marks omitted). Put differently, the Guidance indicated that manufacturers were free to *exclude* allulose from the Total Sugars declaration pending future rulemaking—a reversal from the FDA's position in the 2016 Rule.[12] Why the about-face? The FDA clarified:

> We have traditionally determined what is captured under the "Total Sugars" declaration on the [Nutrition Facts panel] by chemical structure. Due to advances

---

[11] Because the plaintiffs' complaint (1) references the final Allulose Guidance, and (2) includes the final Allulose Guidance as an attachment, the Court may consider the document when evaluating Chobani's motion to dismiss. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Even if the complaint were silent on the Allulose Guidance, however, the Court could still consider the document without converting Chobani's motion into one for summary judgment. *Id.* (information "that is properly subject to judicial notice" may be considered on a motion to dismiss); *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997) (courts may "take judicial notice of matters of public record"); *see, e.g.*, *Martinez v. Mead Johnson & Co.*, No. 22-cv-00213, 2022 WL 15053334, at *4 (C.D. Cal. Oct. 22, 2022) (taking judicial notice of publicly available FDA guidance).

[12] The FDA's 2016 position—allulose is a sugar for purposes of the Nutrition-Panel Regulation—carries no extra force simply because it appeared in a final rule. *See, e.g.*, *Wilgar Land Co. v. Dir.*, 85 F.4th 828, 837-38 (6th Cir. 2023) (responses to comments in final rules may help clarify ambiguity, but cannot modify regulations). The 2016 position purported to interpret the Nutrition-Panel Regulation without reaching a final decision, and the Allulose Guidance does the same.

in food technology, novel sugars are now available that are not metabolized and that do not contribute [as many calories] to the diet [as] other traditional sugars. Consequently, we need to consider how information about sugars like allulose should be captured on the label.

Our current thinking is that, consistent with the goal of section 403(q) of the Federal Food, Drug, and Cosmetic Act for . . . nutrient declarations to assist consumers in maintaining healthy dietary practices, we should consider not only the chemical structure of sugars, but also other evidence, including their association with [cavities] and how they are metabolized in the body (e.g., caloric contribution and their effect on blood glucose and insulin levels), when determining whether a sugar should be included in the declaration of "Total Sugars" on the [Nutrition Facts panel].

*Id.* at 6.[13] Allulose, the Guidance continued, differs from other monosaccharides in important ways: It has fewer calories per gram, it does not meaningfully increase blood glucose or insulin levels, and it does not promote cavities. *See id.* at 6-8. Based on these differences (and given the Administration's new approach), the document concluded that allulose should not be listed under Total Sugars simply because it is a monosaccharide. Thus: "[W]e intend to exercise enforcement discretion with respect to the exclusion of allulose from the amount of Total Sugars declared on the [Nutrition Facts panel] pending future rulemaking regarding amending the definition of Total Sugars." *Id.* at 8 (quotation marks omitted). Under the FDA's "current thinking," *id.* at 6, allulose should not be treated as a sugar for purposes of the Nutrition-Panel Regulation, even though it chemically resembles fructose and is a monosaccharide.

---

[13] Consumers use the Total Sugars declaration, the Guidance reasoned, to determine three things: (1) how many calories "are contributed by sugars in their diet," (2) whether a product "contains sugars that are likely to cause an increase in circulating blood glucose and insulin levels," and (3) the contribution "of sugars in their diet to the risk" of tooth decay. Allulose Guidance 7. Including sugars that (1) have a lower-than-average caloric content, (2) do not affect blood glucose or insulin levels, and (3) do not affect the likelihood of cavities under Total Sugars would be counterintuitive.

### 3.    Subsequent Developments

Although the 2016 Rule and the Allulose Guidance both reference "future rulemaking," the FDA has not yet issued a notice of proposed rulemaking regarding allulose. Food Labeling: Revision of the Nutrition and Supplement Facts Labels, 81 Fed. Reg. at 33,796; Allulose Guidance 8. Shortly after it issued the Allulose Guidance, the Administration did "establish[] a docket inviting public comments" on how "sugars that are metabolized differently than traditional sugars" should be treated in the Total Sugars declaration of the Nutrition Facts panel. Compl. 23 ¶ 97; *see* Sugars that Are Metabolized Differently than Traditional Sugars, 85 Fed. Reg. 66,335, 66,337-38 (Oct. 19, 2020). But as far as the Court can tell, nothing became of that docket.

Since publication of the Allulose Guidance, then, the FDA has not revised the Nutrition-Panel Regulation. Nor has it altered the Labeling Regulation: While the docket announcement above signaled the FDA's intent to "address [labeling regulations] related to sugars . . . at a later date," the Administration has not indicated "when, if ever, that later date will come." Sugars that Are Metabolized Differently than Traditional Sugars, 85 Fed. Reg. at 66,336 n.1; Compl. 24 ¶ 101 (quotation marks omitted).

So to recap, neither the Nutrition-Panel Regulation nor the Labeling Regulation has changed since the issuance of the Allulose Guidance. But the FDA has expressly advised the industry that it does not view allulose as a "sugar" within the meaning of the Nutrition-Panel Regulation and will not take enforcement action against manufacturers who exclude allulose from the Total Sugars declaration in the Nutrition Facts panel.

The FDA confirmed this state of affairs in a 2022 letter (the "Tagatose Letter") responding to "a request . . . to exempt tagatose," another monosaccharide, "from classification as an added

sugar" on the Nutrition Facts panel.[14] Compl. 25 ¶ 104; *see* Resp. Ex. 1 ("Tagatose Letter") at 1, ECF No. 26-2. As relevant here, the Tagatose Letter reiterated that "[o]ur regulations, at § 101.9(c)(6)(ii), . . . define Total Sugars[] as the sum of all free mono- and disaccharides." Tagatose Letter 4 (quotation marks omitted). "[W]hile we issued an enforcement discretion guidance regarding" allulose and the Nutrition Facts panel, the Letter continued, "we declined at that time to amend our regulations [to explicitly exempt allulose] . . . because we wanted to further consider [the properties of allulose and related monosaccharides] in a potential future rulemaking." *Id.* at 5. Tagatose and allulose "are not necessarily identical such that we could consider treating them identically," it concluded, and so "[w]e are not prepared to amend our regulations regarding the declaration of [tagatose] on Nutrition Facts [panels] at this time." *See id.* (noting that tagatose has a higher caloric content than allulose).

### C.     The Chobani TMP

There is one more piece of background required to fully understand the plaintiffs' arguments, and that is Chobani's temporary marketing permit (the "Chobani TMP"). In order to "ensure that the characteristics, ingredients and production processes of specific foods are consistent with what consumers expect," the FDA has established "Standards of Identity" for various food products. *Standards of Identity for Food*, U.S. FDA, https://www.fda.gov/food/ nutrition-food-labeling-and-critical-foods/standards-identity-food (last updated Jan. 14, 2025).

---

[14] The Court can look to the Tagatose Letter (referenced in the complaint and a matter of public record) in evaluating Chobani's motion to dismiss for the same reason it can consider the Allulose Guidance. *See supra* note 11. Total sugars and added sugars must be declared separately on the Nutrition Facts panel, and separate provisions of 21 C.F.R. § 101.9(c)(6) apply to the different declarations. *See* 21 C.F.R. § 101.9(c)(6)(ii)-(iii). Added sugars "are either added during the processing of foods, or are packaged as such, and include sugars (free, mono and disaccharides), sugars from syrups and honey, and [certain excess] sugars from concentrated fruit or vegetable juices." *Id.* § 101.9(c)(6)(iii).

But recognizing that "appropriate investigations of potential advances in food technology sometimes require tests in interstate markets of the advantages to and acceptance by consumers of experimental packs of food varying from applicable definitions and standards," the Administration occasionally grants temporary marketing permits allowing companies to diverge from the applicable standard or standards of identity. 21 C.F.R. § 130.17(a)-(b).

In March 2023, the FDA granted one such permit to Chobani.[15] Under the applicable standard of identity, a product labeled "yogurt" must contain "[c]ream, milk, partially skimmed milk, skim milk, or the reconstituted versions of these ingredients . . . alone or in combination." *Id.* § 131.200(a)-(b); *see* Milk and Cream Products and Yogurt Products; Final Rule to Revoke the Standards for Lowfat Yogurt and Nonfat Yogurt and to Amend the Standard for Yogurt, 86 Fed. Reg. 31,117, 31,118-20 (June 11, 2021). But Chobani Zero Sugar contains only "ultrafiltered nonfat milk as the basic dairy ingredient," meaning that without a temporary marketing permit, selling Chobani Zero Sugar as "yogurt" would be improper. *See* Resp. Ex. 5 ("Chobani Appl.") at 1, ECF No. 26-6. The Chobani TMP resolves this issue, allowing Chobani to "manufacture [and sell] yogurts using ultrafiltered nonfat milk . . . [with] the addition of water and non-nutritive sweeteners." Yogurt Products Deviating from Standard of Identity; Temporary Permit for Market Testing, 88 Fed. Reg. 18,322, 18,323 (Mar. 28, 2023).

As part of its application for a temporary marketing permit, Chobani submitted to the FDA a proposed label for Chobani Zero Sugar. *See* 21 C.F.R. § 130.17(c)(9) (application must include

---

[15] The Court may consider both Chobani's application for a temporary marketing permit (available on Chobani's website) and the Chobani TMP in its evaluation of Chobani's motion to dismiss. *See supra* note 11; *Newbold v. State Farm Mut. Auto. Ins. Co.*, No. 13-cv-09131, 2015 WL 13658554, at *4 n.7 (N.D. Ill. Jan. 23, 2015) ("[C]ourts may take judicial notice of undisputed material hosted on a party's public website."); *Vincent v. Medtronic, Inc.*, 221 F. Supp. 3d 1005, 1007 (N.D. Ill. 2016) ("[A]gency determinations are subject to judicial notice and may be considered even if not mentioned in the complaint.").

"[t]he proposed label (or an accurate draft) to be used on the food to be market tested"). That label included language nearly identical to the language on the products bought by the plaintiffs:



Chobani Appl. 8. The FDA reviewed the label during its approval process.

## II.    DISCUSSION

In its motion to dismiss, Chobani argues that the plaintiffs' state law claims "are preempted by controlling FDA regulations." Mot. to Dismiss 4, ECF No. 19 (capitalization altered). And even if the claims are not preempted, Chobani says, the case "should be stayed . . . given the significance of [the] question [at issue] to the food and beverage industry." *Id.* at 10. Separately, Chobani contends that the plaintiffs "cannot establish specific personal jurisdiction . . . [for] their non-Illinois claims" and "lack [Article III] standing for their claims arising from purchases made in states in which they do not reside." *Id.* at 13. Chobani thus moves to dismiss (1) a large subset of claims under Fed. R. Civ. P. 12(b)(1), (2) all but the Illinois claims under Fed. R. Civ. P. 12(b)(2),

and (3) any remaining claims under Fed. R. Civ. P. 12(b)(6). The Court agrees with Chobani that Lacy and Baker's claims must be dismissed for lack of personal jurisdiction, although it finds personal jurisdiction and subject-matter jurisdiction proper for the Francos' individual claims and all class claims. The Court further agrees with Chobani that the remaining claims are preempted, so it dismisses the complaint for failure to state a claim. Given this dismissal, the Court does not reach Chobani's remaining arguments, including those related to the primary-jurisdiction doctrine.

## A.    Jurisdiction

The Court begins with Chobani's jurisdictional arguments, as it "must ensure the presence of both subject-matter jurisdiction and personal jurisdiction" before "deciding any [claim] on the merits." *Kromrey v. U.S. Dep't of Just.*, 423 F. App'x 624, 626 (7th Cir. 2011); *see id.* (noting that it is "improper to assume jurisdiction and proceed to the merits," even if the merits "are easy [and the] jurisdictional questions [are] hard").

### 1.    Subject-Matter Jurisdiction

As an initial matter, the Court has subject-matter jurisdiction over the plaintiffs' claims under the Class Action Fairness Act (CAFA). The plaintiffs brought their suit as a class action under Fed. R. Civ. P. 23, there are over 100 proposed class members, and CAFA's minimal-diversity requirement is met.[16] 28 U.S.C. § 1332(d)(1)(B), (d)(2)(A), (d)(5). Additionally, given

---

[16] The plaintiffs allege that minimal diversity exists because (1) Chobani "is not a citizen of California," and (2) the proposed class "includes many California residents." Compl. 4 ¶¶ 12-13. But the Court finds minimal diversity for a different reason. In *City of East St. Louis v. Netflix, Inc.*, the Seventh Circuit held that, for CAFA purposes, an LLC is a citizen of "the State where it has its principal place of business and the State under whose laws it is organized." 83 F.4th 1066, 1070-71 (7th Cir. 2023) (quoting 28 U.S.C. § 1332(d)(10)); *see also, e.g.*, *Calchi v. TopCo Assocs.*, 752 F. Supp. 3d 955, 964-65 (N.D. Ill. 2024). Under this rule, Chobani is a citizen of Delaware and New York, making it diverse from at least some members of the proposed nationwide class. Compl. 4 ¶ 12. Chobani may also be diverse from the four named plaintiffs, although the complaint alleges residency (Illinois, Arizona, and Kansas) for those parties when it should have alleged

---

the size of the proposed class and the allegations in the complaint,[17] the Court can "plausibly infer that the amount in controversy" is greater than $5 million.[18] *Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 733 (7th Cir. 2021); *see* 28 U.S.C. § 1332(d)(2).

That conclusion, however, does not end the inquiry. Because Article III standing "is [also] an element of subject-matter jurisdiction in a federal civil action," the Court must examine the plaintiffs' standing as well. *Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1057 (7th Cir. 2018). According to the complaint, the named plaintiffs bought Chobani Zero Sugar in Illinois (the Francos), Arizona (Lacy), and Kansas (Baker). Compl. 3-4 ¶¶ 8-11; *see supra* section I.A; *supra* note 3 and accompanying text. Is harm in those three states sufficient to confer standing for all 40 consumer-protection counts? *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press . . . .").

Chobani, citing *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, No. 09-cv-03690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013), says no. In *Dairy Farmers*, the plaintiffs alleged that they suffered harm when they "purchased Defendants' . . . products from retailers in New York, Tennessee, Michigan, and Kansas." *Id.* at *7. The court found these allegations "sufficient to establish injury-in-fact . . . with respect to those jurisdictions." *Id.* But the plaintiffs had also "assert[ed] claims under the statutes and common law of . . . other" jurisdictions, and the

---

citizenship. *Id.* at 3-4 ¶¶ 8-11; *see Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012).

[17] *See, e.g.*, Compl. 28 ¶ 122 (Chobani Zero Sugar sold at around 95,000 retail locations); *id.* ¶ 124 (in the nine months preceding September 2021, Chobani "sold over $1 billion in yogurt products"); *id.* at 29 ¶ 128 (proposed class includes "[a]ll persons in the United States and its territories who purchased" Chobani Zero Sugar).

[18] Because Chobani is not a citizen of Illinois under CAFA, *see supra* note 16, nothing in 28 U.S.C. § 1332(d)(4) prevents the Court from exercising its jurisdiction.

court rejected Article III standing for those claims. *Id.* Because the plaintiffs only alleged injuries "as a result of buying products in New York, Tennessee, Michigan, and Kansas," the court wrote, they "fail[ed] to satisfy their burden of showing Article III standing" for claims not arising under New York, Tennessee, Michigan, and Kansas law. *Id.* at *8. The court also rejected the plaintiffs' argument that it should "postpone its [Article III] inquiry . . . until after class certification," writing that, as a general matter, consideration of standing should precede class certification under Fed. R. Civ. P. 23. *Id.* at *7; *see id.* at *5-6.

Under *Dairy Farmers*, Chobani argues, the plaintiffs have standing to assert only their Illinois, Arizona, and Kansas claims (counts 1 to 3, and perhaps counts 41 to 43). The remaining claims, for which the named plaintiffs have not alleged concrete injuries based on violations of other states' laws, should be dismissed under Fed. R. Civ. P. 12(b)(1). And consistent with *Dairy Farmers*, the Court should not postpone the question of Article III standing "until after class certification." *Id.* at *7.

The problem with Chobani's argument is that *Dairy Farmers* is an "outlier." Resp. 18, ECF No. 26. True, some courts in this District have embraced the *Dairy Farmers* approach, evaluating a named plaintiff's ability to bring out-of-state claims (1) under the rubric of individual standing, and (2) at the outset. *See Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1000 (N.D. Ill. 2017) (collecting cases). But most courts have taken a different path, evaluating such claims (1) through the lens of Rule 23, and (2) as part of class certification. *See Rawson v. ALDI, Inc.*, No. 21-cv-02811, 2022 WL 1556395, at *5 (N.D. Ill. May 17, 2022) (collecting cases); *see also, e.g., In re Beyond Meat, Inc., Protein Content Mktg. & Sales Pracs. Litig.*, 718 F. Supp. 3d 800, 812 (N.D. Ill. 2024) ("The Court agrees with the prevailing view that the question relates to class certification, not Article III standing, and so will resolve this question at a later stage of the proceedings.").

This Court has rejected the *Dairy Farmers* approach in the past,[19] and it continues to embrace the "prevailing view" that whether a named plaintiff can bring out-of-state claims (1) is not a question of Article III standing, and (2) is properly assessed during class certification. *Beyond Meat*, 718 F. Supp. 3d at 812. "There is no question that [the plaintiffs here] have standing in the constitutional sense," as they "allege that [Chobani] injured them by deceptively labeling the products [they] purchased, and they ask the court to redress their injuries by ordering [Chobani] to pay money." *Muir v. Nature's Bounty (DE), Inc.*, No. 15-cv-09835, 2018 WL 3647115, at *6 (N.D. Ill. Aug. 1, 2018). So the baseline requirements of Article III are met, and the fact that the plaintiffs seek recovery under different legal theories—including under the laws of 34 states in which they were not injured—goes to the merits rather than subject-matter jurisdiction. *See Woodman's Food Mkt., Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016) ("[T]he question of who is authorized to bring an action under a statute is one of statutory interpretation; it does not implicate Article III standing . . . ."); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) ("That a plaintiff's claim under his preferred legal theory fails has nothing to do with subject-matter jurisdiction, unless the claim is so feeble as to be essentially fictitious." (cleaned up)).

The plaintiffs, of course, may not be able to prevail on their out-of-state claims. *Cf. Muir*, 2018 WL 3647115, at *7 ("[T]hough they have Article III standing to assert claims under the consumer fraud laws of states other than Illinois, [the plaintiffs] likely could not *prevail* on their own claims under those laws."). But if there is an "imperative that [a] named plaintiff himself have

---

[19] In *Liston v. King.com, Ltd.*, for example, the Court declined to dismiss a count alleging violations "of the consumer protection statutes of all 50 states and the District of Columbia," even though the plaintiff "claim[ed] no injuries in any state other than Illinois." 254 F. Supp. 3d at 994, 998, 1007. Although the Court questioned whether the plaintiff would actually "be able to pursue claims based on statutory causes of action created by states where [he] neither lived nor was injured," it declined to weigh in on the matter "until such time as the question of class certification" was squarely presented. *Id.* at 1001-02.

a valid claim under every legal theory he proposes to assert on behalf of a class," that imperative is "the consequence of the class-certification prerequisites imposed by Rule 23 of the Federal Rules of Civil Procedure, not of Article III." *Id.*; *see* Fed. R. Civ. P. 23(a)(2)-(4), (b)(3) (requiring typicality, adequacy, commonality, and predominance). Given this reasoning, the Court finds Chobani's Rule 12(b)(1) argument unpersuasive, and it will not dismiss any of the plaintiffs' claims for lack of subject-matter jurisdiction at this juncture.[20] To answer the question posed above, harm in Illinois, Arizona, and Kansas is sufficient to confer Article III standing for all 40 consumer-protection counts, although whether the plaintiffs can proceed on all 40 counts is a different matter best left for class certification.

## 2. Personal Jurisdiction

The Court has subject-matter jurisdiction over all of the plaintiffs' claims. But that alone is not enough to proceed to the merits: As noted, the Court must also assure itself of personal jurisdiction over Chobani for each claim at issue.[21] *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, 164 F. Supp. 3d 1040, 1048-49 (N.D. Ill. 2016) (concluding that "personal jurisdiction over the defendant must be established as to each claim asserted"); *see also, e.g.*, *Gillam v. Abro Kalamazoo 3, Inc.*, 712 F. Supp. 3d 1079, 1084 (N.D. Ill. 2024) (similar).

---

[20] Although the Court would typically stay discovery on the out-of-state claims until (1) class certification, or (2) the addition of new class representatives, *see Liston*, 254 F. Supp. 3d at 1001-02, the dismissal of the plaintiffs' claims on other grounds makes this procedural step unnecessary.

[21] Personal jurisdiction is an individual right, and it can, "like other such rights, be waived" or forfeited. *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). But that "is of no moment in a case like this one, in which [a personal-jurisdiction] objection has been fully aired." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014).

The Supreme Court has recognized two kinds of personal jurisdiction: general and specific. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021).[22] General personal jurisdiction, which "extends to any and all claims brought against a defendant," may be exercised only "when a defendant is essentially at home" in the state where the court sits. *Id.* (quotation marks omitted). Specific personal jurisdiction, meanwhile, covers claims that "arise out of or relate to the defendant's contacts with the forum," even where the "defendant is not at home" in the state. *Id.* at 1025.

In Chobani's view, the plaintiffs (1) have "no grounds to argue for general personal jurisdiction," and (2) can only establish specific personal jurisdiction for their Illinois claims. Mot. to Dismiss 13 n.7. Accordingly, Chobani says, all of the plaintiffs' non-Illinois claims "must be dismissed for lack of personal jurisdiction."[23] *Id.* at 13. In response, the plaintiffs argue that (1) Chobani has consented to general personal jurisdiction in Illinois, and (2) they need not establish personal jurisdiction (general or specific) for "unnamed putative class members." Resp. 17. The Court addresses general and specific personal jurisdiction in turn.

### a.   General

The plaintiffs have "no grounds to argue for general personal jurisdiction," according to Chobani, because Chobani is "incorporated in Delaware . . . and has its principal place of business

---

[22] Although *Ford* describes personal jurisdiction as it relates to state courts and the Fourteenth Amendment, its definitions are equally applicable to this case. Personal jurisdiction "is governed by the law of the forum state" when a federal court sits in diversity, and Illinois' long-arm statute allows "the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause." *Kurt v. Platinum Supplemental Ins., Inc.*, No. 19-cv-04520, 2021 WL 3109667, at *5 (N.D. Ill. July 22, 2021) (quotation marks omitted); *see Johnson v. Am. Fam. Ins. Co.*, No. 22-cv-00214, 2023 WL 2733674, at *4 (W.D. Wis. Mar. 31, 2023) ("CAFA jurisdiction is a type of diversity jurisdiction . . . .").

[23] Chobani retreats from this position in its reply, arguing instead that "the out-of-state named plaintiffs . . . must be dismissed" on personal-jurisdiction grounds. Reply 9, ECF No. 29. Given the discussion that follows, Chobani's updated argument is the better one.

in New York." Mot. to Dismiss 13 n.7; *see* Compl. 4 ¶ 12. It is true that, for purposes of general personal jurisdiction, a corporation is "essentially at home" in "its place of incorporation and [its] principal place of business." *Ford*, 141 S. Ct. at 1024 (quotation marks omitted). But Chobani is an LLC, and "an LLC is not a corporation." *Calchi v. TopCo Assocs., LLC*, 676 F. Supp. 3d 604, 610 (N.D. Ill. 2023). LLCs are treated differently than corporations for purposes of diversity jurisdiction. *See Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998) ("[T]he citizenship of an LLC for purposes of . . . diversity jurisdiction is the citizenship of its members."); *but see supra* note 16 (noting that this is not the case for CAFA). Should they be treated differently than corporations for purposes of general personal jurisdiction as well? Perhaps an LLC is "essentially at home" wherever its members are "essentially at home." *Ford*, 141 S. Ct. at 1024 (quotation marks omitted). Or perhaps that would "smack[] of judicial overreach," and an LLC is "essentially at home" only "in its state of organization." *Id.* (quotation marks omitted); *see Avus Designs, Inc. v. Grexx, LLC*, 644 F. Supp. 3d 963, 978 (D. Wyo. 2022) (reaching this conclusion as an apparent matter of first impression).

The Court finds the latter approach more persuasive, as an LLC "can hardly be said to be at home in numerous states scattered all over the country." *Avus*, 644 F. Supp. 3d at 978 (quotation marks omitted) (calling such a result "untenable on its face"). At the very least, an LLC's state of organization and its principal place of business (to the extent it exists) strike the Court as the two most "salient inquiries . . . [for] general personal jurisdiction." *Duncanson v. Wine & Canvas IP Holdings LLC*, No. 16-cv-00788, 2017 WL 6994541, at *2 (S.D. Ind. Apr. 20, 2017). But the Court need not resolve the question here, as even under the former, broader approach, the plaintiffs have not met their burden of showing that Chobani is subject to general personal jurisdiction in Illinois.

Although the plaintiffs "need only make a prima facie showing of jurisdictional facts" at this stage, they still "have the burden of establishing personal jurisdiction." *Kurt v. Platinum Supplemental Ins., Inc.*, No. 19-cv-04520, 2021 WL 3109667, at *5 (N.D. Ill. July 22, 2021) (quotation marks omitted). Here, even assuming that Chobani is at home where its members are at home, there is no allegation that any of Chobani's members (or its members' members, and so on) are domiciled in, incorporated in, or have their principal place of business in this state. Compl. 4 ¶ 12 (saying nothing about the citizenship or identity of Chobani's members); *see Ford*, 141 S. Ct. at 1024. And nothing in the complaint ties Chobani itself to Illinois. Compl. 4 ¶ 12 ("Defendant Chobani, LLC is a Delaware limited liability company with its principal executive office in Norwich, New York."). So regardless of where an LLC is "essentially at home" generally, the plaintiffs have not shown that Chobani is "essentially at home" in Illinois for purposes of this case. *Ford*, 141 S. Ct. at 1024 (quotation marks omitted).

No matter, the plaintiffs say: Proper home notwithstanding, Chobani actively "consented to general personal jurisdiction" in Illinois when it registered to do business in the state. Resp. 18. For this proposition, the plaintiffs rely on two recent decisions: *Mallory v. Norfolk Southern Railway Co.*, 143 S. Ct. 2028 (2023), and *In re Abbott Laboratories Preterm Infant Nutrition Products Liability Litigation*, 685 F. Supp. 3d 678 (N.D. Ill. 2023). In *Mallory*, the Supreme Court found constitutional a Pennsylvania law requiring businesses registered in the state to consent to general personal jurisdiction. 143 S. Ct. at 2037-38. In *Abbot*, Judge Pallmeyer held that (1) Missouri's business-registration law operated like the Pennsylvania law in *Mallory*, and (2) businesses registered in Missouri consented to general personal jurisdiction in that state. 685 F. Supp. 3d at 681-82. True, Judge Pallmeyer recognized, the Missouri law does not explicitly require consent. *See id.* at 682 (noting that registration in Missouri simply "subjects [a] foreign

corporation to the same duties, restrictions, penalties, and liabilities . . . [as] a domestic corporation of like character" (quotation marks omitted)). And true, the Missouri Supreme Court explicitly held "that a foreign corporation ***does not*** consent to general personal jurisdiction in Missouri when it complies with Missouri's . . . registration statutes." *Id.* (emphasis added) (citing *State ex rel. Norfolk S. Ry. Co. v. Dolan*, 512 S.W.3d 41, 52-53 (Mo. 2017)). But *Mallory* cast doubt on the Missouri Supreme Court's decision, Judge Pallmeyer concluded, and the statutory scheme at issue was similar enough to the one in *Mallory* that *Mallory* controlled for personal-jurisdiction purposes. *See id.*

This case, the plaintiffs insist, is just like *Abbot.* The Illinois business-registration law is nearly identical to Missouri's, *see* 805 Ill. Comp. Stat. 5/13.10 (foreign businesses registered in Illinois are "subject to the same duties, restrictions, penalties, and liabilities . . . [as] a domestic corporation of like character"), and although the Illinois Supreme Court has held that businesses registered in Illinois do not consent to general personal jurisdiction in Illinois, *see Aspen Am. Ins. Co. v. Interstate Warehousing, Inc.*, 90 N.E.3d 440, 447 (Ill. 2017), *Mallory* casts doubt on that decision as well. *Abbot* is persuasive, in the plaintiffs' view, and *Mallory* demands the same result despite Illinois case law and the absence of an express consent provision.

The Court disagrees. *Mallory* "held only that states *may* require corporations to consent to general personal jurisdiction by registering to do business in a state," Reply 10, ECF No. 29, and the Court sees no evidence that Illinois has imposed such a requirement in its business-registration law. Indeed, that is precisely what the Illinois Supreme Court said in *Aspen*, the case cited above. *See* 90 N.E.3d at 447 ("We hold . . . that in the ***absence of any language to the contrary***, the fact that a foreign corporation has registered to do business under the Act does not mean that the corporation has thereby consented to general jurisdiction over all causes of action . . . ." (emphasis

added)). Nothing in *Mallory* demands a different result or upsets this conclusion, which is based squarely on statutory interpretation.

What is more, *Abbot* is no longer good law. In December 2023, "with the benefit of further briefing," Judge Pallmeyer concluded that her earlier personal-jurisdiction holding "was [made] in error" and reversed it. *See In re Abbott Lab'ys Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22-cv-02011, 2023 WL 8527415, at *4-5 (N.D. Ill. Dec. 8, 2023). Properly read, Judge Pallmeyer wrote, *Mallory* "says nothing about the current interpretation of Missouri's corporate registration statutes." *Id.* at *5. While *Mallory* held "that a state *may* constitutionally subject to foreign corporations to general jurisdiction through a registration statute," the Missouri Supreme Court concluded "that Missouri's *own* registration statute does no such thing," and it was "outside the court's province to question the Missouri Supreme Court's own interpretation of Missouri Law," especially when "Missouri's statute does not explicitly mention general jurisdiction." *Id.* at *3, *5 (quotation marks omitted). So too here: It is not the Court's "province" to question the Illinois Supreme Court's interpretation of its own law, particularly when the law is silent regarding personal jurisdiction and consent thereto. *Id.* at *5 (quotation marks omitted); *see* 805 Ill. Comp. Stat. 5/13.10, 180/45-5.

To the extent the plaintiffs rely on Judge Pallmeyer's original *Abbot* decision, that decision is unpersuasive. The Court lacks general personal jurisdiction over Chobani.

### b.     Specific

Specific personal jurisdiction, however, is a different matter. Chobani recognizes as much, conceding in its briefing that specific personal jurisdiction exists for the plaintiffs' Illinois claims.[24]

---

[24] Given the concession, Chobani has forfeited any argument that its contacts with Illinois (1) do not constitute purposeful availment, or (2) are unrelated to the claims at issue. *See Ford*,

*See* Mot. to Dismiss 13 (arguing only that the plaintiffs "cannot establish specific personal jurisdiction . . . [for] their non-Illinois claims"). But Chobani urges the Court to dismiss the remaining claims, arguing that they have no connection with this state.

In support of its argument, Chobani cites *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017). There, the Supreme Court "held that out-of-state plaintiffs [cannot] rely on their out-of-state purchases to establish [specific] personal jurisdiction over [a] defendant" in a given state.[25] Mot. to Dismiss 13; *see Bristol-Myers Squibb*, 582 U.S. at 264-66. Here, Chobani says, all of the non-Illinois claims involve out-of-state residents and out-of-state purchases, and so all of the non-Illinois claims must be dismissed for lack of specific personal jurisdiction. *See* Compl. 3 ¶ 10 (Lacy is an Arizona resident who purchased Chobani Zero Sugar in Arizona); *id.* at 3-4 ¶ 11 (Baker is a Kansas resident who purchased Chobani Zero Sugar in Kansas); *id.* at 29-35 ¶ 129 (putative subclass members are residents of other states who presumably purchased Chobani Zero Sugar in those states).

Chobani has *Bristol-Meyers Squibb* a bit wrong. That case was a "mass action" with hundreds of named plaintiffs, and so the Supreme Court found it appropriate to assess specific personal jurisdiction for each plaintiff in the suit. *See Mussat v. IQVIA, Inc.*, 953 F.3d 441, 445-46 (7th Cir. 2020). But a mass action is different than a class action, and the Seventh Circuit has clarified that in a class action, only "the named [class] representatives must be able to demonstrate either general or specific personal jurisdiction." *Id.* at 447; *see also id.* at 445 ("Once certified, the

---

141 S. Ct. at 1024-25; *supra* note 21 (indicating that personal-jurisdiction arguments can be waived or forfeited).

[25] Although *Bristol-Meyers Squibb* concerned "the due process limits on the exercise of specific [personal] jurisdiction by a State" under the Fourteenth Amendment, it applies here because the Court is sitting in diversity. *See* 582 U.S. at 268-69 (leaving open "the question [of] whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court"); *supra* note 22.

class as a whole is the litigating entity, and its affiliation with a forum depends only on the named plaintiffs." (citation omitted)). So the *Bristol-Meyers Squibb* test applies only to the named plaintiffs in this suit: the Francos, Lacy, and Baker.

Chobani is right that Lacy and Baker fail the *Bristol-Meyers Squibb* test, given that they are not Illinois residents and do not allege purchasing Chobani Zero Sugar in Illinois. *See* Compl. 3-4 ¶¶ 10-11. So the Court must dismiss Lacy and Baker's claims for lack of specific personal jurisdiction, although the individual claims brought by the Francos (Illinois residents who purchased Chobani Zero Sugar in the state) may proceed.[26] *See id.* at 3 ¶¶ 8-9. The individual claims brought by Lacy and Baker are dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(2).[27] *See Lauderdale-El v. Ind. Parole Bd.*, 35 F.4th 572, 576-77 (7th Cir. 2022) (dismissals for lack of personal jurisdiction are "necessarily without prejudice").

Where does that leave things? Because the Court has dismissed Lacy and Baker's individual claims, must it also dismiss the claims brought on behalf of the putative Arizona and Kansas subclasses? And what of specific personal jurisdiction for the remaining representative claims? The answers, as it turns out, are fairly straightforward. The Court has specific personal jurisdiction over the Francos' claims, and because the absent class members (residents of other states, including Arizona and Kansas) are not "full parties to the case," the Francos need not show personal jurisdiction for the claims brought on behalf of those individuals. *Mussat*, 953 F.3d at

---

[26] Again, Chobani specifically acknowledges the latter point. In its motion to dismiss, it concedes that the Illinois claims (both individual and representative) are jurisdictionally proper. And in its reply, it indicates that only "the named out-of-state plaintiffs" should be dismissed. Reply 10.

[27] While the Court would ordinarily grant Lacy and Baker leave to amend—perhaps they purchased Chobani Zero Sugar in Illinois but failed to so allege—here it finds that amendment would be futile. *See Loja v. Main St. Acquisition Corp.*, 906 F.3d 680, 684-85 (7th Cir. 2018). Even if Lacy and Baker could adequately allege personal jurisdiction, that is, their individual and representative claims would be preempted for the reasons discussed below.

447-48 ("[A] district court need not have personal jurisdiction over the claims of absent class members at all."). So while it is true that specific personal jurisdiction must be assessed on a claim-by-claim basis, the only relevant claims here are the individual claims brought by the Francos. Those claims pass muster, and so the remaining representative claims (including the claims brought by the Francos on behalf of the Arizona and Kansas subclasses) may proceed.[28] *See id.* at 448 ("[I]f the court has personal jurisdiction over the defendant with respect to the class representative's claim, the case may proceed. . . . [A] a class action may extend beyond the boundaries of the state where the lead plaintiff brings the case.").

In sum, despite the dismissal of Lacy and Baker's individual claims, the Court's personal-jurisdiction analysis leaves the complaint (including all of its representative claims) intact.[29] Finding the requirements for subject-matter and personal jurisdiction satisfied, the Court proceeds to the merits of the Francos' representative and individual claims.

**B.      Preemption**

"Dismissal for failure to state a claim under Rule 12(b)(6) is proper when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bland v. Edward D. Jones & Co.*, 375 F. Supp. 3d 962, 971 (N.D. Ill. 2019) (quotation marks omitted). Chobani argues

---

[28] Notably, this would not work in the opposite direction. If only Lacy and Baker sued, for example, they could not sustain their representative claims even though some encompassed purchases in Illinois made by Illinois consumers. *See Denberg v. U.S. R.R. Ret. Bd.*, 696 F.2d 1193, 1197 (7th Cir. 1983) ("Since the district court never had jurisdiction over the claim of the class representative, . . . it had no jurisdiction over the class action either even if the claims of some of the members of the class were within its jurisdiction.").

[29] As discussed, the Francos have Article III standing to assert all of the representative claims. *See supra* section II.A.1.

that the plaintiffs cannot "raise a claim of entitlement to relief" because all of their claims are preempted by federal law.[30] *Id.* (quotation marks omitted). The Court agrees.

### 1. Legal Standard

"Preemption is an affirmative defense, and pleadings need not anticipate or attempt to circumvent affirmative defenses" to survive a motion to dismiss. *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010) (citation omitted). Nonetheless, "it may be appropriate to grant a Rule 12(b)(6) motion to dismiss based on an affirmative defense, such as preemption, where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Buxton v. 1237 Fullerton LLC*, No. 22-cv-06269, 2023 WL 7314054, at *1 (N.D. Ill. Aug. 22, 2023) (quotation marks omitted) ("If the plaintiff pleads himself out of court by presenting all relevant facts, such that he has essentially admitted all the ingredients of [a] . . . defense, then the Court may dispose of the case by granting a . . . motion to dismiss." (cleaned up)). Here, the complaint sets forth everything necessary to satisfy preemption: By referencing the Allulose Guidance and arguing that its claims are not in fact preempted, the complaint opens the door to dismissal on preemption grounds.[31] *See supra* section I.A; *supra* note 11.

The Court, then, can consider Chobani's preemption arguments. Two Seventh Circuit cases are particularly relevant to the Court's analysis: *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020), and *Turek v. General Mills, Inc.*, 662 F.3d 423 (7th Cir. 2011). Both cases concerned 21 U.S.C. § 343-1, which reads in relevant part as follows:

---

[30] Because the individual claims of Lacy and Baker have been dismissed, the Court uses "the plaintiffs" to refer to the Francos from this point forward.

[31] Although the plaintiffs assert that Chobani "placed its compliance with FDA . . . regulations at issue [through the] preemption and abstention" arguments in its motion to dismiss, Resp. 2, the complaint is the document placing such compliance at issue, *see, e.g.*, Compl. 13 ¶ 51 (arguing that Chobani's "deceptive labeling also violates federal laws and regulations regarding food labeling and packaging, such that [the] state law claims are not subject to any preemption").

(a) Except [with the permission of the FDA], no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce—

. . . .

(5) any requirement respecting any claim of the type described in section 343(r)(1) of this title made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title, [with a certain exception not applicable in this case].

21 U.S.C. § 343-1(a)(5). In section I.B above, the Court distinguished between nutrition-panel regulations and labeling regulations; claims "of the type described in section 343(r)(1)" are label claims characterizing "the level of [a] nutrient" like sugar, and "the requirement of section 343(r) of this title" refers generally to the labeling regulations promulgated by the FDA. *Id.*; *see id.* § 343(r)(1)-(2). So, states may impose requirements for food labeling *identical* to those put in place by the Commissioner, but they may not impose a requirement that differs from the applicable labeling regulation or regulations.[32] A different requirement is, in effect, preempted by federal law. *See Bell*, 982 F.3d at 483 (referring to § 343-1 as the Food, Drug, and Cosmetic Act's "express preemption provision").

In *Turek*, the Seventh Circuit held that state law claims seeking to impose additional labeling requirements on a food product (that is, requirements beyond those imposed by the relevant labeling regulation) were preempted based on the language above. 662 F.3d at 427. In *Bell*, by contrast, the Seventh Circuit held that state law claims challenging labels (1) not

---

[32] A state may impose an identical requirement so that it can "enforce a violation of the [Nutrition Labeling and Education] Act as a violation of state law," which "is important because the Food, Drug, and Cosmetic Act does not create a private right of action." *Turek*, 662 F.3d at 426. But a state may not impose a different requirement, as that could create inconsistent and undesirable results. *See id.* ("It is easy to see why Congress would not want to allow states to impose disclosure requirements of their own on packaged food products, most of which are sold nationwide. Manufacturers might have to print 50 different labels, driving consumers who buy food products in more than one state crazy.").

authorized by the FDA, but (2) voluntarily added by the seller were not preempted.[33] 982 F.3d at 484-85. Absent language protecting a particular statement, the *Bell* court wrote, § 343-1 does not "expressly preempt state-law prohibitions on deceptive statements that sellers add voluntarily to their labels or advertising." *See id.* at 484 (concluding that if state law prohibits such a statement, it does "not establish any new," different requirement for food labeling). Read together, *Turek* and *Bell* stand for the following proposition: A state law claim is preempted if it seeks to impose a new labeling requirement, but it is not preempted if it challenges a voluntarily added label that has not been authorized by the FDA. As a corollary, a state law claim is not preempted if it challenges a voluntarily added label that violates federal law; if a claim is prohibited by the FDA, it is certainly not authorized by the Administration.[34]

## 2. Regulatory Scheme

Chobani argues that this case is like *Turek*, insisting that the plaintiffs "seek to impose different requirements [on Chobani] than those enforced by the FDA for the labeling of allulose." Mot. to Dismiss 4. The plaintiffs, on the other hand, argue that this case is like *Bell*. Chobani Zero Sugar's labeling claims are voluntary, they say, and no law or FDA regulation specifically authorizes those claims. In fact, the plaintiffs add, the labeling claims are "equally prohibited by

---

[33] *Bell* dealt with standards of identity rather than labeling regulations, but just as states cannot impose requirements that differ from labeling regulations, they cannot impose requirements that differ from labeling rules set out in standards of identity. 21 U.S.C. § 343-1(a)(1); *see Bell*, 982 F.3d at 484 ("If an [FDA] standard of identity said that a vegetable label must indicate the vegetable's color, date of harvest, and common name, the preemption provision would prohibit a state from adding a further requirement that all vegetable labels also list the country of origin.").

[34] This makes good sense. If a label violates federal law, a state law challenge to that label (assuming a private right of action) imposes a requirement identical to the requirement already imposed by statute or FDA regulation. *See, e.g.*, *Lanovaz v. Twinings N. Am., Inc.*, No. 12-cv-02646, 2013 WL 675929, at *3 (N.D. Cal. Feb. 25, 2013) (noting that § 343-1 has been "repeatedly interpreted not to preempt requirements imposed by state law that effectively parallel or mirror the relevant sections" of the Nutrition Labeling and Education Act).

both state and federal law," as the "zero sugar statements at issue" are explicitly "prohibited by FDA regulations." Resp. 5 (quotation marks omitted).

At the outset, the Court finds this case closer to *Bell* than *Turek.* As the plaintiffs note, they are "not saying Chobani needs to add anything to its label." *Id.* at 8 n.3; *cf. Turek*, 662 F.3d at 427 (noting that the plaintiff wanted "disclaimers . . . added to the labeling of the defendants' inulin-containing chewy bars"). Instead, they are claiming that "part of the label voluntarily added by [Chobani] is violative of [various] state laws." Resp. 8 n.3. So the Court must determine whether the labeling of Chobani Zero Sugar is authorized by federal law, or whether federal law (1) is silent on, or (2) prohibits the relevant statements. If the former, the plaintiffs' claims are preempted. If the latter, the claims can move forward.

In the plaintiffs' view, the Labeling Regulation prohibits calling something with four grams of allulose per serving "sugar-free" or "zero sugar." *See supra* section I.A (noting that Chobani Zero Sugar has four grams of allulose per serving); *supra* section I.B.1 (discussing the Labeling Regulation in detail). The Labeling Regulation, after all, says that such phrases may not be used unless the product "contains less than 0.5 g of sugars, as defined in § 101.9(c)(6)(ii), per reference amount customarily consumed and per labeled serving." 21 C.F.R. § 101.60(c)(1)(i). And 21 C.F.R. § 101.9(c)(6)(ii) defines "sugars" as "free mono- and disaccharides (such as glucose, fructose, lactose, and sucrose)." *Id.* § 101.9(c)(6)(ii); *see supra* section I.B.1 (discussing the Nutrition-Panel Regulation in detail). Allulose is a monosaccharide, and the plaintiffs thus contend that phrases like "sugar-free" and "zero sugar" may not be used for a product with four (*i.e.*, more than 0.5) grams of allulose per serving.

Additionally, the plaintiffs note, the Labeling Regulation prohibits phrases like "sugar-free" and "zero sugar" unless sugars listed in the ingredient statement are "followed by an asterisk"

with one of the following disclaimers: "adds a trivial amount of sugar," "adds a negligible amount of sugar," or "adds a dietarily insignificant amount of sugar." 21 C.F.R. § 101.60(c)(1)(ii). In the plaintiffs' telling, Chobani fell short when it failed to add an asterisk after allulose—a sugar—in its initial ingredient list. And it acknowledged that error when it amended Chobani Zero Sugar's ingredient list to add an asterisk:



Resp. 7; *see id.* at 8 (arguing that Chobani has implicitly "conceded . . . the original version of its label . . . violated the" Labeling Regulation).

The plaintiffs acknowledge the existence of the Allulose Guidance. But that document, they say, does not change the above conclusions for two reasons. First, the Guidance is entirely voluntary: Its preamble states that it "is not binding on [the] FDA or the public," and it purports to exempt allulose from 21 C.F.R. § 101.9(c)(6)(ii) through "enforcement discretion" only. Allulose Guidance 1, 8; *see supra* section I.B.2. Indeed, the Tagatose Letter confirms that 21 C.F.R. § 101.9(c)(6)(ii) continues to define total sugars on the Nutrition Facts panel "as the sum of all free mono- and disaccharides."[35] Tagatose Letter 4; *see supra* section I.B.3. Second, the Allulose

---

[35] The plaintiffs, it is worth noting, quote some language from the Tagatose Letter out of context. The FDA wrote in the Letter that "we do not have two different definitions of sugar on

Guidance is "strictly limited to" the Nutrition-Panel Regulation and the Nutrition Facts panel, and it "says nothing at all about . . . any" labeling regulation. Resp. 9. Chobani, the plaintiffs say, implicitly acknowledged that fact when it added an allulose asterisk to the ingredient list. If Chobani believed the Allulose Guidance exempted allulose from the definition of sugar in the Labeling Regulation, why would it treat allulose as a sugar for purposes of 21 C.F.R. § 101.60(c)(1)(ii)?

The plaintiffs essentially argue that (1) the Allulose Guidance has no legal effect on the definition of sugar in 21 C.F.R. § 101.9(c)(6)(ii), and (2) even if it did, it would impact only the Nutrition-Panel Regulation and would not affect the Labeling Regulation. Because these arguments are central to the preemption question, the Court examines them before returning to the main preemption points.

### a. Legal Effect

The plaintiffs are correct that the Allulose Guidance says it is "not binding on [the] FDA or the public." Allulose Guidance 1. But the document represents the FDA's official view as to allulose and 21 C.F.R. § 101.9(c)(6)(ii), and that view is controlling "unless plainly erroneous or inconsistent with" the regulation "or there is any other reason to doubt that [it] reflect[s] the FDA's fair and considered judgment." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613 (2011) (quotation marks

---

food and beverage packaging," Tagatose Letter 4 (quotation marks omitted), which the plaintiffs read to mean that 21 C.F.R. § 101.9(c)(6)(ii) treats "all mono- and disaccharides like allulose as sugar" despite the Allulose Guidance, Resp. 6. But the "two different definitions of sugar" to which the Letter refers are not allulose on the one hand and other monosaccharides on the other; they are total sugars on the one hand and added sugars on the other. *See* Tagatose Letter 4 (noting that total sugars, as defined in 21 C.F.R. § 101.9(c)(6)(ii), and added sugars, as defined in 21 C.F.R. § 101.9(c)(6)(iii), both reference free mono- and disaccharides). The Tagatose Letter, in other words, says nothing about how the FDA treats allulose versus other sugars in light of the Allulose Guidance. If anything, it stands for the (undisputed) proposition that the Allulose Guidance did not formally amend 21 C.F.R. § 101.9(c)(6)(ii).

omitted).[36] In the Court's view, the Allulose Guidance (1) is consistent with the language of 21 C.F.R. § 101.9(c)(6)(ii), and (2) reflects the "fair and considered judgment" of the FDA. *Id.*

As explained in section I.B.1 above, 21 C.F.R. § 101.9(c)(6)(ii) defines a sugar as "a free mono- [or] disaccharide[] (such as glucose, fructose, lactose, and sucrose)." If that definition ended after the word "disaccharide," the Allulose Guidance might be inconsistent with the regulation's plain terms. (Again, allulose is a monosaccharide.) But the definition does not end there: To be a sugar, a substance must be a free mono- or disaccharide "such as glucose, fructose, lactose, [or] sucrose." 21 C.F.R. § 101.9(c)(6)(ii); *see Gillespie v. Trans Union, LLC*, 433 F. Supp. 2d 908, 914 (N.D. Ill. 2006) ("Courts are to avoid interpretations of agency regulations which render words superfluous."), *aff'd sub nom. Gillespie v. Trans Union Corp.*, 482 F.3d 907 (7th Cir. 2007). What does it mean to be a substance "such as" glucose, fructose, lactose, or sucrose? These are examples of mono- and disaccharides, and it is reasonable to read the regulation as having a purpose in providing them—namely, to limit the types of mono- and disaccharides that are included in the definition of a sugar set forth in § 101.9(c)(6)(ii). Presumably, then, in the context of the Nutrition Facts panel (and other locations where this definition is used), to be a mono- or disaccharide "such as" glucose, fructose, lactose, or sucrose means to present the same nutritional characteristics as those sugars present.[37] So understood, the FDA's interpretation of the phrase in the Allulose

---

[36] In other words, the FDA's official interpretation of 21 C.F.R. § 101.9(c)(6)(ii) in the Allulose Guidance receives *Auer* deference. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997). While the Supreme Court has abrogated *Chevron* deference, *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), *Auer* and its progeny remain good law, *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019) ("*Auer* deference retains an important role in construing agency regulations."). The plaintiffs contend that *PLIVA* is inapposite because it dealt with a different regulatory scheme than the one at issue here, *see* Resp. 10 n.4, but it is not clear why a different regulatory scheme would affect the general principle laid out in *PLIVA*.

[37] To the extent the Court must empty its "legal toolkit" before finding 21 C.F.R. § 101.9(c)(6)(ii) genuinely ambiguous, it finds nothing in the regulation's text, structure, history, or purpose revealing a single correct reading of the regulation as it relates to allulose. *Kisor*, 139

Guidance—a substance "such as" glucose, fructose, etc., is one that provides an expected number of calories per gram, increases blood glucose and insulin levels, and can lead to cavities—is eminently reasonable. So too is the FDA's view that allulose does not fall within the "such as" bucket (and should therefore not be counted as a sugar in the Total Sugars declaration). Nothing in the Allulose Guidance is "plainly erroneous or inconsistent with" the language of 21 C.F.R. § 101.9(c)(6)(ii). *PLIVA*, 564 U.S. at 613 (quotation marks omitted).

And there is no "reason to doubt that" the Allulose Guidance reflects "the FDA's fair and considered judgment." *Id.* The FDA based the final Guidance on "data and information . . . in citizen petitions and [on] comments" in response to a published draft, and the Guidance carefully analyzes how allulose fits into 21 C.F.R. § 101.9(c)(6)(ii) given the purpose of that regulation and "advances in food technology." Allulose Guidance 1, 6. Because nothing in the Allulose Guidance strikes the Court as arbitrary or poorly reasoned, and because reading 21 C.F.R. § 101.9(c)(6)(ii) to exclude allulose is permissible, the views in the Guidance "are controlling" for preemption purposes.[38] *PLIVA*, 564 U.S. at 613 (quotation marks omitted).

The plaintiffs push back against this conclusion, citing the Tagatose Letter and *Reid v. Johnson & Johnson,* 780 F.3d 952 (9th Cir. 2015). The former, the plaintiffs say, demonstrates that the Allulose Guidance "did nothing to exempt allulose from the current regulatory definition of sugar and the related" Labeling Regulation. *See* Resp. 6-7. And the latter, according to the plaintiffs, stands for the proposition that "non-binding FDA enforcement discretion guidance . . .

---

S. Ct. at 2415. While the 2016 Rule indicated that allulose should be listed in the Total Sugars declaration, the statement so indicating was at most interpretive guidance. *See supra* note 12.

[38] This conclusion makes sense as a practical matter. It is hard to imagine that the FDA simultaneously intended to allow (1) manufacturers to omit allulose from the Total Sugars declaration, and (2) consumers to sue under state law based on that omission.

[cannot] preempt state law." *Id.* at 10 (quotation marks omitted). Neither source changes the Court's conclusion.

The proposition for which the plaintiffs cite the Tagatose Letter is essentially a non sequitur. Of course the Allulose Guidance did nothing to explicitly amend 21 C.F.R. § 101.9(c)(6)(ii); neither the Letter nor Chobani contends otherwise. *See supra* note 35 (making this point, and explaining that the plaintiffs misinterpret a key part of the Letter); Reply 4 ("Chobani has never claimed that [the] FDA has formally issued a new regulation amending the definition of sugar."). The key question is whether the Allulose Guidance (and the interpretation therein) is controlling, and on that question the Tagatose Letter is silent. *See* Reply 4 ("That . . . letter says [the] FDA has determined that tagatose does not have the same properties as allulose and should not be treated the same as allulose for the purposes of labeling—demonstrating that [the] FDA is carefully reviewing how each sweetener should be labeled. Nothing in the letter contradicts or rescinds [the] FDA's guidance about allulose.").

*Reid*, meanwhile, is not nearly as broad as the plaintiffs contend. In *Reid*, the Ninth Circuit did hold that the FDA guidance at issue (made available as a letter) lacked preemptive effect. 780 F.3d at 964. But the *Reid* panel recognized that "some agency actions short of notice-and-comment rulemaking may have the force of law," and it reached its conclusion not because the guidance document was a guidance document,[39] but because the document couched its language "in tentative and non-committal terms." *Id.* at 964-65.

_____

[39] The *Reid* panel wrote that "enforcement guidelines like those set forth in the [relevant] letter are beyond the *Chevron* pale," seemingly implying that enforcement-discretion guidelines cannot have preemptive effect. 780 F.3d at 964 (quotation marks omitted) (concluding that documents lacking the force of law under *Chevron* cannot preempt state law); *see United States v. Mead Corp.*, 533 U.S. 218, 234 (2001). But the key words in the quoted language are "like those set forth in the [relevant] letter." *Reid*, 780 F.3d at 964. If the *Reid* panel concluded that FDA enforcement guidance can *never* preempt state law, as the plaintiffs argue, it would not have

Comparing the language of the *Reid* letter to the language of the Allulose Guidance shows that the two documents (and these two cases) are easily distinguishable. Here is how the *Reid* court characterized the relevant letter:

> The letter does not promise that the FDA will not enforce its existing regulation . . . . Instead, the letter provides that the FDA "intends to consider the exercise of enforcement discretion" in certain circumstances. . . . [T]he letter's plain language does not [explicitly] authorize any . . . claims that conflict with the FDA's existing . . . rule. The letter only expresses the FDA's "intent" to "consider" enforcement discretion while the FDA continues deliberations regarding whether a change to that rule is appropriate. The FDA's equivocal language regarding its intention to foreclose its own ability to enforce noncompliance with existing rules is a good indication that it did not intend to foreclose state law challenges to . . . claims that do not comply with existing [FDA] rules.

*Id.* at 965 (quoting the letter). The Allulose Guidance, by contrast, contains no "equivocal language." *Id.*; *see supra* note 38 (noting that the FDA likely intended to foreclose state law challenges). It "advises manufacturers of [the FDA's] intent to exercise enforcement discretion for the exclusion of allulose from" the Total Sugars declaration, and it states in no uncertain terms that the FDA *will* exercise its discretion "pending future rulemaking regarding amending the definition of Total Sugars." Allulose Guidance 1, 8 (quotation marks omitted); *cf. Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 737-38 (7th Cir. 2019) (comparing a document listing "11 factors that make an enforcement action less likely" with one announcing "to an entire industry what behavior is and is not authorized" (quotation marks omitted)). Put simply, the Allulose Guidance represents the FDA's "authoritative [and] official position" rather than an "ad hoc statement not reflecting the agency's views." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (quotation marks omitted) (noting that deference of the type accorded in *PLIVA* is appropriate under such

---

needed to examine the characteristics of the specific document at issue to reach its conclusion. Since *Reid*, the Ninth Circuit has confirmed that courts "may look to guidance documents when applying *Auer* deference." *Backcountry Against Dumps v. Fed. Aviation Admin.*, 77 F.4th 1260, 1268 (9th Cir. 2023).

circumstances). *Reid* is distinguishable, not dispositive, and consistent with *PLIVA*, the Allulose Guidance has binding legal effect.

### b.      Scope

Even so, the plaintiffs say, the Allulose Guidance only affects the Nutrition-Panel Regulation; it does not affect the Labeling Regulation. But this second argument is no more persuasive than the first, as it attempts to draw a line between the Nutrition-Panel Regulation and Labeling Regulation that simply does not exist.

It is true that, as a general matter, nutrition-panel regulations and labeling regulations govern different domains of a product's packaging. *See supra* section I.B.1 (explaining this mutual exclusivity); *see also, e.g.*, *Nacarino v. Kashi Co.*, 77 F.4th 1201, 1204-05 (9th Cir. 2023) (same). So if the Nutrition-Panel Regulation and the Labeling Regulation had nothing to say about one another, the Allulose Guidance—which is specific to 21 C.F.R. § 101.9(c)(6)(ii), the Nutrition-Panel Regulation—would govern only the former. But that is not the case here, as the Labeling Regulation *specifically incorporates* the definition of sugar in the Nutrition-Panel Regulation. According to the Labeling Regulation, a product may be labeled "sugar-free" or "zero sugar" only if it "contains less than 0.5 g of sugars, ***as defined in § 101.9(c)(6)(ii)***, per reference amount customarily consumed and per labeled serving." 21 C.F.R. § 101.60(c)(1)(i) (emphasis added). Given this explicit cross-reference, the Allulose Guidance (and its exemption of allulose from the definition of sugar) applies to both 21 C.F.R. § 101.9(c)(6)(ii) and 21 C.F.R. § 101.60(c)(1). *See Nacarino*, 77 F.4th at 1208-09 (addressing a similar scenario and concluding that cross-references like the one here do not render 21 C.F.R. § 101.13(c), cited above, superfluous).

Chobani Zero Sugar would violate the Labeling Regulation if it contained 0.5 or more grams of sugar, "as defined in § 101.9(c)(6)(ii)," per serving. 21 C.F.R. § 101.60(c)(1)(i). Perhaps

the plaintiffs consider allulose a sugar, but under the binding Allulose Guidance, it is not a sugar "as defined in § 101.9(c)(6)(ii)." *Id.* So the fact that Chobani Zero Sugar contains four grams of allulose per serving carries no significance, and the statements at issue are not prohibited by 21 C.F.R. § 101.60(c)(1)(i).

The plaintiffs again push back, pointing out that Chobani treats allulose like a sugar "as defined in § 101.9(c)(6)(ii)" elsewhere on Chobani Zero Sugar's packaging. *Id.* If the Allulose Guidance applied to the Labeling Regulation, the plaintiffs ask, why would Chobani feel the need to add an asterisk after allulose in the ingredient list? The Labeling Regulation, they say, only requires an asterisk when an ingredient "is a sugar."[40] *Id.* § 101.60(c)(1)(ii); *see* Resp. 8 ("[I]f allulose is a sugar for purposes of § 101.60(c)(1)(ii), as Chobani now admits, it is also a sugar for purposes of § 101.60(c)(1)(i)." (emphasis omitted)).

This line of argument is unavailing. Chobani's inclusion of an allulose asterisk in its updated label is not an admission of any kind; the company could have added the asterisk for a number of different reasons.[41] Consumers, for example, may view allulose as something sweet, prompting Chobani to reiterate that the presence of allulose in Chobani Zero Sugar is dietarily insignificant. *Cf.* Resp. 7 (showing asterisks next to "skim milk" and "vegetable juice concentrate"). As discussed below, there was nothing wrong with Chobani's exclusion of an

---

[40] In reality, the Labeling Regulation requires asterisks for ingredients that (1) are sugars, or (2) are "generally understood by consumers to contain sugars." 21 C.F.R. § 101.60(c)(1)(ii); *see supra* section I.B.1. The plaintiffs do not argue that allulose needed an asterisk in the original Chobani Zero Sugar label because allulose "is generally understood by consumers to contain sugars," *id.*, and so the Court does not address that argument here or elsewhere.

[41] Put differently, Chobani's addition could be entirely unrelated to its views on whether allulose is a sugar under the Labeling Regulation. Chobani says it added the asterisk at the FDA's request, and it asks the Court to take notice of various Chobani TMP emails to that effect. Reply 7 & n. 4; Rule 201 Resp. 1, ECF No. 32. The plaintiffs object to the Court taking judicial notice of the emails. Rule 201 Obj. 1-2, ECF No. 30. Because the reason Chobani added the asterisk is not material to the Court's preemption decision, the plaintiffs' objection is denied as moot.

alluose asterisk in its original label. Its inclusion of such an asterisk in the updated label says nothing about the applicability of the Allulose Guidance to the Labeling Regulation, and to the extent the inclusion might be improper (as opposed to, say, unnecessary), the plaintiffs have forfeited that argument by failing to raise it here.

### c. The Present Claims

Stepping back: Recall that, because this case is like *Bell*, the Court must determine whether federal law (1) authorizes, (2) is silent on, or (3) prohibits the labeling of Chobani Zero Sugar. Recall, too, that the plaintiffs advance two arguments for option three (and thus no preemption). First, the plaintiffs say, Chobani Zero Sugar violates 21 C.F.R. § 101.60(c)(1)(i) because it contains four grams of sugar per serving. Second, they add, it violates (or at least violated) 21 C.F.R. § 101.60(c)(1)(ii) given the missing asterisk in the ingredient list. The conclusions above make quick work of both arguments.

Chobani Zero Sugar does not violate 21 C.F.R. § 101.60(c)(1)(i), because under the binding Allulose Guidance (which applies to both the Nutrition-Panel and Labeling Regulations), allulose is not a sugar, and Chobani Zero Sugar contains zero grams of sugar per serving. And Chobani Zero Sugar does not (or at least did not) violate 21 C.F.R. § 101.60(c)(1)(ii). Because "sugar" in 21 C.F.R. § 101.60(c)(1)(ii) has the same meaning as "sugar" in 21 C.F.R. § 101.60(c)(1)(i), Chobani was not wrong to omit an asterisk after allulose in its original label.[42] *See, e.g.*, *White v. United Airlines, Inc.*, 987 F.3d 616, 623 (7th Cir. 2021). The Labeling Regulation does not prohibit any "sugar-free" or "zero sugar" statement on Chobani Zero Sugar's label.

---

[42] Again, the plaintiffs do not argue that Chobani Zero Sugar should have included an asterisk because allulose is "generally understood by consumers to contain sugars." 21 C.F.R. § 101.60(c)(1)(ii); *see supra* note 40. Nor do the plaintiffs argue that there is anything wrong with the current inclusion of an asterisk after allulose.

Quite the opposite. In view of the Allulose Guidance, the Labeling Regulation explicitly *authorizes* Chobani Zero Sugar's "sugar-free" and "zero sugar" statements. *See* 21 C.F.R. § 101.60(c)(1) (noting that terms such as "zero sugar" may be used when a product contains less than 0.5 grams of sugar per serving, when ingredients that are sugars or generally understood to contain sugars are followed by an asterisk, and when certain statements regarding calories are present). Under *Bell*, then, the remaining claims are expressly preempted by federal law.[43] *See* 982 F.3d at 484 (noting that § 343-1 preempts voluntarily added statements when there is language protecting those statements). The Francos' individual and representative claims are therefore dismissed with prejudice. *See Turek*, 662 F.3d at 425 (if a state law claim is preempted, dismissal with prejudice is the proper outcome).

### C.    Additional Arguments

The parties make several additional arguments for and against this case moving forward. Chobani, for example, argues that (1) the plaintiffs' claims are conflict preempted given the Chobani TMP,[44] and (2) the case should be stayed under the primary-jurisdiction doctrine if it is

---

[43] Because the individual and representative consumer-protection claims are preempted, counts 41 to 43 (seeking the imposition of a constructive trust, disgorgement based on unjust enrichment, and declaratory relief, respectively) are also preempted and cannot proceed. Only the Francos remain in this suit, so Illinois law governs those counts. *See Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915-16 (7th Cir. 2006) (in Illinois, the place of the injury generally controls which law applies to tort claims). And under Illinois law, none of the counts can stand once the underlying claims to which they relate have been dismissed. *See, e.g.*, *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 796 (N.D. Ill. 2010) (constructive trust); *Barrientos v. Fitness Member Servs., LLC*, 749 F. Supp. 3d 944, 959 (N.D. Ill. 2024) (unjust enrichment); *State Farm Fire & Cas. Co. v. John*, 80 N.E.3d 679, 684 (Ill. App. Ct. 2017) (declaratory judgment).

[44] More specifically, Chobani argues that when the FDA approved its application for a temporary marketing permit, it expressly signed off on the "sugar-free" and "zero sugar" statements the plaintiffs challenge here. *See Bell*, 982 F.3d at 486 (conflict preemption occurs when it is impossible to obey both state and federal law). While the plaintiffs claim the Chobani TMP resembles the temporary marketing permit in *Bell* (which the Seventh Circuit found insufficient for conflict-preemption purposes), the Court notes that the label in this case is more closely related to the standard-of-identity exemption than the challenged *Bell* label. *Compare id.*

not dismissed. *See supra* section I.C; *Taradejna v. Gen. Mills, Inc.*, 909 F. Supp. 2d 1128, 1134 (D. Minn. 2012) (the primary-jurisdiction doctrine, used "to coordinate judicial and administrative decision making," allows a court to stay a case when "enforcement of the claim requires the resolution of issues" best addressed by agency expertise (quotation marks omitted)). The parties also disagree as to whether (1) the Illinois claims fall within the Illinois Consumer Fraud Act's safe-harbor provision, (2) a reasonable consumer would be deceived by Chobani Zero Sugar's label, and (3) the unjust-enrichment claim can proceed. Because the Court resolves the Francos' claims based on express preemption (and addresses Lacy and Baker's claims on other grounds), it need not consider these arguments.

## III.    CONCLUSION

For the foregoing reasons, Chobani's motion to dismiss is granted. The individual claims brought by Lacy and Baker are dismissed without prejudice. All remaining claims (the individual and representative claims brought by the Francos) are dismissed with prejudice.

---

at 485-86 (no indication that the FDA evaluated a "100% Grated Parmesan Cheese" label when it granted a temporary marketing permit related to curing period (quotation marks omitted)), *with* Yogurt Products Deviating from Standard of Identity; Temporary Permit for Market Testing, 88 Fed. Reg. at 18,323 (allowing Chobani to "manufacture yogurts using ultrafiltered nonfat milk as a basic ingredient through the addition of water ***and non-nutritive sweeteners***" (emphasis added)); *see generally* 21 C.F.R. § 130.17(e) (permit may not be issued unless the FDA "concludes that ***the variation*** . . . will not result in failure of the food to conform to any provision" of the Food, Drug, and Cosmetic Act, except for the relevant standard-of-identity provision (emphasis added)). Nonetheless, the Court observes that the label in the Chobani TMP is different than the label at issue in the complaint: The former has a "sugar asterisk when listing allulose in the ingredient list," while the latter does not. Resp. 12. Given the express-preemption finding above, it is unnecessary to definitively resolve the conflict-preemption issue.

Date: May 29, 2025

John J. Tharp, Jr.
United States District Judge